**Melissa HENDRICHSEN,**
**Plaintiff–Appellant,**

v.

**BALL STATE UNIVERSITY, et al., Defendants–Appellees.**

No. 03–2044.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 28, 2004.

Decided Aug. 19, 2004.

Rehearing En Banc Denied
Nov. 5, 2004.*

* Judge Rovner did not participate in the consideration of petition for rehearing en banc.

Thomas D. Margolis, Muncie, IN, for Plaintiff–Appellant.

Scott E. Shockley, Defur, Voran, Hanley, Radcliff & Reed, Muncie, IN, for Defendants–Appellees.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

### ORDER

When an anonymous individual began leaving flowers and notes for Ball State University junior Melissa Hendrichsen, she was flattered. Her appreciation turned to dismay when she learned the identity of her would-be admirer—her Computer Science professor, Alexander Koslov, a new hire from Russia. When Hendrichsen complained to the university, Koslov's overtures ceased, but Ball State did not formally discipline him. Dissatisfied with Ball State's handling of the incident, Hendrichsen sued the university, Koslov, and ten unnamed "Does"—university administrators who had helped process Hendrichsen's complaint—under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, and 42 U.S.C. § 1983. She alleged that Koslov's advances had created a hostile learning environment, in violation of Title IX, and that the defendants had violated her equal protection rights. The district court ruled in favor of the defendants on the parties' cross-motions for summary judgment. Because Koslov's actions were not severe or pervasive enough to create a hostile learning environment, and Ball State was not deliberately indifferent in response to Hendrichsen's complaint about Koslov, we affirm.

### I

In the spring semester of 2001, Hendrichsen, a single mother, had just over one year left to complete her undergraduate degree in Computer Science. To complete her major requirements, she enrolled in Computer Science 121, which was to be taught by Koslov. Nothing unusual occurred during the semester, although once Koslov stayed on campus late helping Hendrichsen and several other students complete a lab assignment. During the course of the evening Hendrichsen learned that she and Koslov lived in the same university housing complex, and so she gave him a ride home when they finished the lab.

Shortly before the semester ended, Koslov contacted Hendrichsen, whom he considered one of his best students, and asked for her assistance in creating the final exam. First he brought several sample

questions over to her apartment and solicited her opinion about how many similar questions the students could complete during the time allotted for the final. Then, the weekend before finals, Koslov called Hendrichsen and told her that she needed to score only 50–60% on the final to maintain her A in the class, and that she should focus on her five other courses. He arranged to come to her apartment on Saturday evening; when he arrived, he had the final exam and persuaded Hendrichsen to take it at that time. Although Koslov denies doing so, Hendrichsen claims that while she was taking the exam Koslov placed the answers out next to her.

Finals week marked the beginning of a series of anonymous deliveries to Hendrichsen's apartment that she ultimately learned were from Koslov. Each morning from Monday, April 30, through Friday, May 4, Hendrichsen discovered flowers outside of her door. On May 5, the flowers came with the following typed note: "The semester is over. Congratulations! Be healthy, lucky and happy!" Hendrichsen responded with a plate of cookies and her own note thanking the unknown individual for the flowers and asking for his identity. In response, the still-anonymous Koslov scrawled a picture of two mountain peaks with a pickax at their base. Hendrichsen, who thought the notes were from a fellow student, then left a note suggesting that the two see a movie together. Still communicating via notes on Hendrichsen's door, they agreed to meet at her apartment on Monday, May 7, at about 6:40 p.m.

That evening Hendrichsen was on the phone with neighbors Tracy and Bob Taylor when she saw Koslov approach her apartment. Shocked to learn that Koslov was her secret admirer, she hid inside her apartment for about 20 minutes until neither she nor the Taylors could see him lingering outside. She then ran to the Taylors' apartment, where she wrote a note apologizing for the misunderstanding and telling Koslov that, although she was flattered, his behavior was inappropriate because he was a professor and she was a student. Then Bob Taylor hung Hendrichsen's note on her door, and they watched from the Taylors' apartment until Koslov took the note and left. Hendrichsen then went with the Taylors to McDonalds.

When she returned to her apartment, she found another note from Koslov. In it Koslov wrote that because he was *"not a professor"* and Hendrichsen was *"not a student ... friendly relations are appropriate always"*; he went on to assure Hendrichsen that he was an "honest person and *never* [would] cross the borders of decency," and promised to return "close to 9." The next morning, Tuesday, May 8, Hendrichsen found a computer programming book with a short note, flowers, and a longer note. In the long note Koslov described in detail his relationship with one of his three closest friends, a female classmate who had died the year before of a heart attack. He explained that although they had seen each other infrequently, they had a "mental and soul unity": "acquaintances thought [they] were lovers—really [they] didn't touch each other" because they "had no need" even though "[c]ertainly [they] could have a sexual contact." The note continued: "Now I have met you. You are full of attractiveness, and clever and mind [sic], and I feel a deep sympathy with you. I hope I can be useful for you and baby. So everything depends on you." In closing, Koslov invited Hendrichsen to his birthday party the following Monday, telling her, "If after thoughtful mood you shall decide that some kind of relations is possible—just phone me, if not—simply return this letter to my mailbox."

The same day that Hendrichsen found the flowers and latest notes, she gathered up all of the notes and showed them to several administrators in the Computer Science Department, including the department chair, the assistant director, and the systems administrator. The department chair immediately referred her to the ombudsperson, who took Hendrichsen directly to the Equal Opportunity and Affirmative Action Office. EOAA staff made an appointment for Hendrichsen to come in the following morning, May 9, and file an official discrimination complaint.

The same day that she filed her complaint Hendrichsen again found flowers by her door, and the Taylors also saw Koslov watching Hendrichsen's apartment. The Taylors called the Ball State Police, but the police said they could not do anything unless Hendrichsen called them herself. Hendrichsen then complained to Deb Newman in University Housing, but asked Newman not to issue a "no trespass" order until Koslov learned about Hendrichson's EOAA complaint. The next morning Koslov was again watching Hendrichsen's apartment, but by the time the Ball State Police arrived he was gone. That day, May 10, Hendrichsen again spoke to Newman, who sent Koslov a "trespass warning" instructing him to avoid approaching Hendrichsen's apartment or face eviction or arrest by university police. At that point Koslov got the message and left Hendrichsen alone.

On May 14 Sali Falling, the Director of the EOAA, and EOAA employee Jennie Bruce met with Koslov to discuss Hendrichsen's complaint. They warned Koslov at that time not to contact Hendrichsen. Then on May 17 the EOAA made a formal finding that Koslov's actions, although unprofessional, did not amount to sexual harassment. The EOAA's report reminded Koslov to continue to observe University Housing's " 'no trespass' warning" and the EOAA's previous warning to stay away from Hendrichsen. He was also instructed to avoid future disciplinary action by maintaining "a professional distance from all students," and told that if he retaliated against Hendrichsen for complaining he would be disciplined. That day, Koslov went out of his way to get to the laundry room by using the sidewalk that ran in front of Hendrichsen's apartment; although his behavior did not violate the "no trespass" order, Hendrichsen viewed it as an act of "intimidation." Aside from that day, Koslov continued to keep his distance from Hendrichsen, and in June 2001 University Housing did not renew his lease.

That same month, Hendrichsen filed a complaint with the Department of Education's Office for Civil Rights. The OCR declined to investigate Hendrichsen's complaint, based on its conclusion that Ball State's EOAA had adequately investigated and responded to the situation. Hendrichsen then filed suit in federal district court, alleging violations of Title IX and the Equal Protection Clause and requesting money damages, costs, and attorneys' fees. In granting summary judgment for the defendants, the district court first assumed that Hendrichsen had sued Koslov only in his official capacity. The court then held that Title IX preempted Hendrichsen's § 1983 claim. That left Hendrichsen's Title IX suit against Ball State, which failed because Hendrichsen had neither demonstrated that Koslov's harassment was severe or pervasive nor shown that Ball State had been deliberately indifferent to the harassment.

II

Initially, there is some confusion surrounding the status of "Does 1–10" and the nature of Hendrichsen's § 1983 claim. Hendrichsen has never made the "Does"

(identified in the complaint as "person(s) with Ball State University that were presented with the matter of Koslov's conduct to the Plaintiff") part of the suit even though their probable identities would seem clear enough. In its order the district court largely ignored them; we do the same, both because Hendrichsen has made nothing of this omission in her brief on appeal and because it appears they were never served. As for the § 1983 claim, it fails for several independent reasons. First, a reading of Hendrichsen's complaint shows that the § 1983 claim is directed only at "Does 1–10." Hendrichsen's discussion of the § 1983 claim in her brief in this court seems to confirm that it was targeted only at named individuals who were never brought into the suit. Assuming, however, that Hendrichsen intended to sue Koslov or Ball State under § 1983, the claim still fails. Hendrichsen nowhere disputes the district court's conclusion that she intended to sue Koslov in his official capacity. But a suit against either Koslov in his official capacity or Ball State (the same thing, really) is tantamount to a suit against the state of Indiana, which is not a "person" amenable to suit under § 1983. See *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Omosegbon v. Wells*, 335 F.3d 668, 672–73 (7th Cir.2003). That leaves Hendrichsen's Title IX claim against Koslov, but it too fails because only a "grant recipient," not an individual, may be sued under Title IX. See *Smith v. Metro. Sch. Dist. Perry Township*, 128 F.3d 1014, 1019–21 (7th Cir.1997).

■ That leaves Hendrichsen's Title IX claim against Ball State. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Thus, an individual may sue a funding recipient for sexual harassment, claiming, as Hendrichsen does, that the harassment created a hostile learning environment. See *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1226 n. 7 (7th Cir.1997); see also *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (allowing damages in private right of action under Title IX); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (recognizing private right of action). To survive summary judgment on her hostile environment claim, Hendrichsen needed to produce evidence that Ball State was deliberately indifferent to sexual harassment that was so severe or pervasive that it altered the conditions of her education. See *Mary M.*, 131 F.3d at 1228; see also *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 646–47, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (student-on-student harassment).

This court has endorsed looking to Title VII law to determine whether the alleged sexual harassment is sufficiently severe or pervasive to constitute illegal discrimination on the basis of sex under Title IX. See *Smith*, 128 F.3d at 1023. In evaluating whether a work environment is objectively hostile under Title VII, we consider the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with, in the case of Title IX, the student's educational opportunities. See *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1034 (7th Cir.2003); *Hilt–Dyson v. City of Chic.*, 282 F.3d 456, 463 (7th Cir.2002); see also *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003) (Title IX).

Hendrichsen repeats throughout her brief that she was "in a hostile educational

environment," but she does not explain how Koslov's conduct amounted to severe or pervasive harassment that deprived her of educational opportunities. The things Hendrichsen points to—"acting in an obsessive manner," "singling her out for his attention," and "notes and flowers and stalking"—are not sufficiently egregious to support her hostile educational environment claim. Including the time Koslov called Hendrichsen for advice about the final in mid-April 2001, his inappropriate behavior toward her lasted at most several weeks. Moreover, the majority of his actions, however inappropriate, neither physically threatened nor humiliated Hendrichson. The only conceivably 'threatening' behavior—"lurking" outside her apartment—happened only several times, and Hendrichsen received only one note—the final note discussing Koslov's "soul mate"—with even arguably objectively offensive content. Finally, Hendrichsen admitted that her academic performance was unaffected by Koslov's behavior. She received an A in his class and went on to obtain almost all As the following two semesters. See *Gabrielle M. v. Park Forest–Chicago Heights, Ill. Sch. Dist. 163,* 315 F.3d 817, 823 (7th Cir.2003) (student-on-student harassment did not deprive plaintiff of access to education when "her grades remained steady and her absenteeism from school did not increase").

█ Even if Hendrichsen had proven that Koslov's actions amounted to severe or pervasive sexual harassment, she has not shown that Ball State reacted with deliberate indifference. She argues that Ball State was deliberately indifferent because 1) EOAA employees Falling and Bruce told Koslov her identity; 2) Falling and Bruce did not interview the Taylors; 3) Newman should have done more than issue a no trespass letter to Koslov; and 4) Ball State should have fired Koslov. Although Hendrichsen may wish that Ball State had done more, she does not explain

why what the university *did* do—promptly investigating the situation as soon as she told them about it, issuing Koslov a no-trespass letter, and warning him not to contact or retaliate against Hendrichsen—could be considered "clearly unreasonable" in light of the known circumstances. See *Davis,* 526 U.S. at 630, 119 S.Ct. 1661. The supposed shortcomings she points to are particularly unpersuasive given the fact that Koslov's unwanted attention (with the exception of walking one time on the sidewalk in front of her apartment) ceased the same day she alerted Ball State to his behavior. We conclude that no rational factfinder could find that Ball State made an "official decision . . . not to remedy" the situation, *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), especially since, by and large, the situation remedied itself as soon as Ball State became involved.

For these reasons, we AFFIRM the judgment of the district court.